**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **MICHAEL LEE JIMENEZ,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. CIV-15-1087-R** |
| | ) | |
| **ROBERT PATTON,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## REPORT AND RECOMMENDATION

Michael Jimenez, a state prisoner, has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, challenging the constitutionality of his state court conviction. (ECF No. 1). Mr. Patton has filed his Response to Petition for Writ of Habeas Corpus. (ECF No. 8). For the reasons set forth below, it is recommended that the Petition be **DENIED**.

## I.    BACKGROUND AND ISSUES PRESENTED

On December 7, 2010, Mr. Jimenez was charged with first degree murder for fatally shooting Jose Cruz. At a preliminary hearing, and in exchange for a plea agreement, co-Defendant Brandon Jones testified against Mr. Jimenez and implicated him as the shooter. At trial, Mr. Jones was unavailable to testify as his whereabouts were unknown. However, one day before the State rested its case, Mr. Jones was arrested on unrelated charges, rendering him technically available to testify. But instead of reopening his case and calling Mr. Jones as a witness, defense counsel moved for a mistrial. The motion was overruled and on March 28, 2013, a jury convicted Mr.

Jimenez of first-degree murder. On August 19, 2014, the Oklahoma Court of Criminal Appeals (OCCA) affirmed the conviction.

As grounds for habeas relief, Mr. Jimenez alleges:

1.  Violation of the Confrontation Clause through the admission of prior testimony from Mr. Jones;

2.  Violation of the Confrontation Clause through the admission of testimony from Medical Examiner Dr. Eric Pfeifer;

3.  Prosecutorial misconduct through improper bolstering and vouching for State witnesses; withholding information; and arousing passion and prejudice in the jury and sympathy for the victim;

4.  Ineffective assistance of counsel; and

5.  Cumulative error.

(ECF No. 1-1). [1]

## II. STANDARD OF REVIEW

In accordance with the Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA"), this Court's power to grant habeas corpus relief to state prisoners is limited. *Snow v. Sirmons,* 474 F.3d 693, 696 (10th Cir. 2007). Under the AEDPA, "the standard of review applicable to each claim depends upon how that claim was resolved by the state courts." *Alverson v. Workman,* 595 F.3d 1142, 1146 (10th Cir. 2010) (citing *Snow,* 474 F.3d at 696). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated

---

[1]     In support of his grounds for habeas relief, Mr. Jimenez incorporates, by reference, the grounds raised in his direct appeal brief which he has attached as an exhibit to the habeas petition. *See* ECF No. 1-1.

the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011).

Under the AEDPA, a petitioner is entitled to federal habeas relief only if the merits-based adjudication "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2) (1996). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan,* 550 U.S. 465, 473 (2007). Review under § 2254(d) is limited to the record that was before the state court that adjudicated the claim on the merits. *See Cullen v. Pinholster,* 563 U.S. 170 (2011). "If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." *Id.* at 185. "It is the petitioner's burden to make this showing and it is a burden intentionally designed to be 'difficult to meet.'" *Owens v. Trammell*, 792 F.3d 1234, 1242 (10th Cir. 2015) (citation omitted).

This Court first determines "whether the petitioner's claim is based on clearly established federal law, focusing exclusively on Supreme Court decisions." *Hanson v. Sherrod*, 797 F.3d 810, 824 (10th Cir. 2015). "A legal principle is 'clearly established' within the meaning of this provision only when it is embodied in a holding of [the United States Supreme Court.]" *Thaler v. Haynes*, 559 U.S. 43, 47 (2010). If clearly

established federal law exists, this Court then considers whether the state court decision was contrary to or an unreasonable application of clearly established federal law. *See Owens,* 792 F.3d at 1242.

"A state court's decision is 'contrary to' clearly established federal law 'if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Court has on a set of materially indistinguishable facts.'" *Id.* (citation omitted). Notably, "[i]t is not enough that the state court decided an issue contrary to a lower federal court's conception of how the rule should be applied; the state court decision must be 'diametrically different' and 'mutually opposed' to the Supreme Court decision itself." *Id.* (citation omitted).

The "'unreasonable application' prong requires [the petitioner to prove] that the state court 'identified the correct governing legal principle from Supreme Court decisions but unreasonably applied that principle to the facts of the prisoner's case.'" *Id.* (citation and internal brackets omitted). On this point, "the relevant inquiry is not whether the state court's application of federal law was *incorrect*, but whether it was 'objectively unreasonable.'" *Id.* (citation omitted, emphasis in original). So, to qualify for habeas relief on this prong, a petitioner must show that there was "'no reasonable basis' for the state court's determination." *Id.* at 1242-43 (citation omitted).

In sum, "[u]nder § 2254(d), a habeas court must determine what arguments or theories supported . . . the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are

inconsistent with the holding in a prior decision of [the Supreme] Court." *Harrington,* 562 U.S. at 102. Relief is warranted only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Id.* The deference embodied in § 2254(d) "reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* at 102-03 (citation omitted).

If the state appellate court has not addressed the merits of a claim, this Court exercises its independent judgment. *See Littlejohn v. Trammell*, 704 F.3d 817, 825 (10th Cir. 2013) ("For federal habeas claims not adjudicated on the merits in state-court proceedings, we exercise our 'independent judgment.'" (citation omitted)). But "[a]ny state-court findings of fact *that bear upon the claim* are entitled to a presumption of correctness rebuttable only by 'clear and convincing evidence.'" *Hooks v. Workman*, 689 F.3d 1148, 1164 (10th Cir. 2012) (emphasis added) (quoting 28 U.S.C. § 2254(e)(1)).

## III. GROUND ONE

In Ground One, Mr. Jimenez alleges a violation of the Confrontation Clause through the introduction at trial of Brandon Jones' preliminary hearing testimony. (ECF No. 1-1:6-11). The OCCA rejected this argument on direct appeal. (ECF No. 8-3:3-7). The Court should conclude that the OCCA's determination was reasonable.

### A. The Sixth Amendment Right of Confrontation

The "main and essential" purpose of the Sixth Amendment's Confrontation Clause "is to secure for the opponent the opportunity of cross-examination." *Delaware*

*v. Van Arsdall*, 475 U.S. 673, 678 (1986) (internal quotation marks and citation omitted). The United States Supreme Court has focused on the importance of the *opportunity* for effective cross-examination, and has stressed that the Confrontation Clause does not guarantee "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id.* at 679 (citation omitted).

The Confrontation Clause is not violated through the admission, at trial, of testimonial statements given by a witness, if the witness is unavailable to testify and the defendant was afforded a prior opportunity for cross-examination. *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). In *Crawford*, the United States Supreme Court stated that "testimonial" statements would include "prior testimony at a preliminary hearing." *Id.* at 68.

### B.     Brandon Jones' Testimony and Unavailability

Mr. Jones testified at the preliminary hearing as part of a plea agreement. Testimony of Brandon Jones Preliminary Hearing July 6, 2011, before the Honorable Larry A. Jones Judge Presiding, *State of Oklahoma v. Jimenez*, Case No. CF-2010-7726 (Okla. Co. Dist. Ct. July 6, 2011)) (TR. P.H.). In exchange for his testimony, the State dismissed three charges against Mr. Jones, including a charge of first-degree murder. Criminal Appeal Original Record, *State v. Jimenez*, Case No. CF-2010-7726 (Okla. Co. Dist. Ct.) Volume II at 388 ("Criminal Appeal Original Record"). Additionally, Mr. Jones received a 15-year sentence on a charge of Robbery with a Firearm with all but the first 6 months suspended. *Id.*

During Mr. Jimenez' trial, Mr. Jones could not be found. Volume I Transcript of Proceedings had on the 25th day of March, 2013, before the Honorable Donald L. Deason, *State of Oklahoma v. Jimenez*, Case No. CF-2010-7726 (Okla. Co. Dist. Ct. Mar. 25, 2013) at 12-20 (Trial TR. Vol. I); (Volume II Transcript of Proceedings had on the 26th day of March, 2013 before the Honorable Donald L. Deason, *State of Oklahoma v. Jimenez*, Case No. CF-2010-7726 (Okla. Co. Dist. Ct. Mar. 26, 2013) at 97-100 (Trial TR. Vol. II). As a result, the court deemed Mr. Jones unavailable to testify and his preliminary hearing testimony was read into the record and entered as evidence. (Trial TR. Vol. II 101).

Mr. Jones testified that he had taken Petitioner to Mr. Cruz' home to collect money and on the way there, the two stopped at a tire shop. At the tire shop, they picked up another person named D-Town and Mr. Jones testified that he believes Mr. Jimenez also procured a gun while at the shop. (TR. P.H. 4-7). Upon arriving at Mr. Cruz' home, Mr. Jimenez and Mr. Jones went to a back bedroom to confront Mr. Cruz and demand the money he allegedly owed. (TR. P.H. 12-13). Mr. Jimenez pulled out a gun and spoke to several men in the room in Spanish and then shot the gun in the air. (TR. P.H. 13). Following the shot, the men gave their cell phones and wallets to Petitioner. (TR. P.H. 13-14). After the men gave over their property, Mr. Jones and Petitioner decided to leave and take Mr. Cruz with them. (TR. P.H. 15-17). Mr. Jimenez led Mr. Cruz out of his home at gunpoint and once outside, Mr. Cruz lunged for the gun. (TR. P.H. 18). Mr. Jimenez and Mr. Cruz wrestled over the gun and eventually Petitioner regained possession. (TR. P.H. 18). According to Mr. Jones, Mr. Cruz started to run

away and Petitioner shot him. (TR. P.H. 18-19). After the shooting, Mr. Jimenez, Mr. Jones, and D-Town drove off in Mr. Jones' car. (TR. P.H. 21). The three men went back to the tire shop where Mr. Jimenez hid the gun. (TR. P.H. 22-23).

On cross-examination, Mr. Jones confirmed that he had testified as part of a plea agreement and that following his testimony, he was "getting to go home." (TR. P.H. 33). Mr. Jones also confirmed that if he did not testify, he would not get to go home that day. (TR. P.H. 33).

At some point during the trial, and after Mr. Jones' testimony had been read into the record, he was arrested and detained in the Oklahoma County Jail, rendering him technically available to testify. Defense counsel alerted the court regarding Mr. Jones' status and the court asked defense counsel if Mr. Jimenez wanted to reopen his case to call Mr. Jones as a witness. Volume IV Transcript of Proceedings had on the 28th day of March, 2013, before the Honorable Donald L. Deason, *State of Oklahoma v. Jimenez*, Case No. CF-2010-7726 (Okla. Co. Dist. Ct. Mar. 28, 2013) at 4-7 (Trial TR. Vol. IV). Defense counsel declined and instead moved for a mistrial, arguing that Mr. Jimenez wanted to "start over." (Trial TR. Vol. IV 6). The court overruled the motion for a mistrial and defense counsel confirmed that the court's original ruling on Mr. Jones' unavailability was not in error. (Trial TR. Vol. IV 6-8).

### C.    No Violation of the Confrontation Clause

In Ground One, Mr. Jimenez argues that his Sixth Amendment right of confrontation was violated through the trial court's admission of Mr. Jones' preliminary hearing testimony. According to Petitioner, defense counsel at the preliminary hearing

was ineffective in cross-examining Mr. Jones regarding the specific details of his plea agreement. (ECF No. 1-1:7-9). As a result, Petitioner contends that the jury was denied important impeachment evidence regarding Mr. Jones' credibility and whether a motive existed for Mr. Jones to lie. (ECF No. 1-1:7-9).

The OCCA rejected this claim on direct appeal. (ECF No. 8-3:3-7). In doing so, the court analyzed the claim under *Crawford v. Washington*, 541 U.S. 36 (2004), and stated:

> Jones was unavailable for trial and use of his preliminary hearing testimony did not violate Jimenez' right to confrontation. Preliminary hearing counsel was not ineffective in cross-examining Mr. Jones. Jurors were sufficiently informed of Jones' plea bargain to test his motives for testifying.

(ECF No. 8-3:7).

Additionally, the OCCA cited specific examples of comments that both parties had made to the jurors during voir dire and opening statements which alerted jurors that in exchange for his testimony, Mr. Jones received "probation on a murder case," along with only having to serve a six-month sentence on a robbery charge. (ECF No. 8-3:4-5). The evidence proves that the jury was adequately informed of the details regarding Mr. Jones' plea agreement and his possible motivations for testifying. Thus, the Court should conclude that the OCCA's determination was reasonable.

The United States Supreme Court has recognized that an important purpose inherent in the right of cross-examination is the exposure of a witness' motivation in testifying. *Davis v. Alaska*, 415 U.S. 308, 316-17 (1974). If, however, a party is improperly denied the opportunity to impeach a witness for bias, the error is analyzed

for harmlessness. *Van Arsdall*, 475 U.S. at 684. A reviewing court should examine "whether the jury had sufficient information to make a discriminating appraisal of the witness' motives and bias." *United States v. Oliver*, 278 F.3d 1035, 1041 (10th Cir. 2001). In doing so, the ultimate inquiry is whether any error that might have been committed during cross-examination was harmless beyond a reasonable doubt. *Van Arsdall*, 475 U.S. at 684.

Here, the OCCA cited specific examples of comments that both parties had made to the jurors during voir dire and opening statements which alerted the jurors to the specific details of Mr. Jones' plea agreement. (ECF No. 8-3:4-5).

During voir dire, defense counsel commented that "someone else who was charged in this case . . . got probation for a murder case." (Trial TR. Vol. I 201). And while questioning potential jurors, defense counsel asked: (1) if jurors could see why someone "would say anything" for probation in a murder case and (2) whether jurors thought that a person who received probation for a murder case should come to court and testify, and (3) whether they would wonder whether the person was telling the truth if they did not appear. (Trial TR. Vol. I 202, 227).

Furthermore, during opening statements the prosecutor told jurors that in exchange for his preliminary hearing testimony, Mr. Jones received a suspended sentence with six months in the county jail on a charge of robbery, a "very good deal." (Trial TR. Vol. II 20). Likewise, during his opening statement, defense counsel stated:

> Brandon Jones is in jail for murder himself. The day of the preliminary hearing, [the prosecutor] makes him an offer. I'll drop your murder charge; I'll give you probation; you can get out of jail today; come downstairs and testify for your friend. [Mr. Jones] does it. He gets his

murder charge dropped. He gets 15 years probation, they can't find him now, and they want you to believe he's truthful. The evidence will be that he said what he needed to say that day to get himself out of jail, to get a murder charge off himself. He got a get-out-of jail-free card, a get-out-of-life-in-prison-free card, and now he won't come back. They can't find him, and he's supposed to be credible.

(Trial TR. Vol. II 32).

Even if defense counsel's cross-examination at the preliminary hearing did not reveal the entirety of the plea deal, jurors were made aware of the entire deal through other comments. Thus, any error during cross-examination in failing to reveal the entirety of the plea deal would have been harmless. The OCCA's decision concluding the same was consistent with Supreme Court precedent and Petitioner is not entitled to habeas relief.

### D. No *Brady* Violation

As stated, Mr. Jones had been deemed "unavailable" to testify at trial and his preliminary hearing testimony had been read into the record as evidence. At some point during trial, however, Mr. Jones was arrested on unrelated charges and held in the Oklahoma County Jail, rendering him technically "available" to testify.

In Ground One, Mr. Jimenez argues that the State had a duty to disclose that Mr. Jones became available to testify before the State rested its case. Mr. Jimenez likens the alleged failure to disclose to a *Brady* violation. *See Brady v. Maryland*, 373 U.S. 83 (1963). According to Mr. Jimenez, if his trial attorney would have known that Mr. Jones was available to testify, "Mr. Jones could have been put on the stand [and] . . . the jury would have had the opportunity to evaluate Mr. Jones' credibility and motivation for testifying under an effective, thorough and full cross-examination." (ECF No. 1-1:11).

The OCCA rejected this claim on direct appeal, stating:

> We will not impute to the State knowledge that Jones had been arrested and jailed on separate offenses unconnected to this case. The State had no duty under *Brady* to discover this and inform Jimenez. The trial court did not err in finding Jones unavailable and did not abuse its discretion in denying Jimenez's request for mistrial.

(ECF No. 8-3:7). The OCCA's determination was reasonable.

In *Brady*, the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. The Supreme Court has also held that the duty to disclose such evidence is applicable even if there is no request by the accused and encompasses impeachment or exculpatory evidence. *United States v. Agurs*, 427 U.S. 97, 107 (1976); *United States v. Bagley*, 473 U.S. 667, 676 (1985). Such evidence is considered material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley, 473 U.S.* at 682. Therefore, in order to comply with *Brady*, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

There are three components of a true *Brady* violation: (1) the evidence at issue must be material and favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued. *Strickler v.*

*Greene*, 527 U.S. 263, 281-82 (1999). In determining whether favorable evidence is considered "material," the test is whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682.

Here, Mr. Jimenez argues a *Brady* violation through the State's failure to disclose Mr. Jones' availability to testify. Petitioner's theory is that if Mr. Jones had testified, the jury would have been apprised of possible impeachment evidence (i.e., the details of the plea agreement—which may have provided a motive for him to testify). The OCCA rejected Petitioner's claim of a *Brady* violation and that determination was reasonable.

First, there is no evidence that the State had knowingly or inadvertently suppressed knowledge that Mr. Jones had become available to testify. On March 28th, 2013, the trial court stated: "[A]pparently Mr. Brandon Jones' counsel advised that sometime during the evening or night hours of March 26th into the 27th, Mr. Jones was arrested on unrelated charges and was in jail and that no one was attempting to bond him out." (Trial TR. Vol. IV 4). The record does not indicate how the trial court became aware of the information—whether the State had knowledge of Mr. Jones' arrest or whether it was Mr. Jones' attorney who informed defense counsel.

Second, Petitioner's theory regarding a *Brady* violation is that the jury was denied important impeachment evidence (i.e., the details of Mr. Jones' plea agreement which may have motivated him to testify). But as discussed, the jury was fully aware of the plea agreement details. Thus, assuming the State suppressed knowledge that Mr. Jones was available to testify, Petitioner has failed to satisfy the materiality test—it is

unlikely that Mr. Jones' testimony would have changed the outcome of the trial because the jury had already been exposed to the impeachment evidence on which Petitioner bases his argument.

Finally, although it does not bear directly on the existence of a *Brady* violation, Petitioner argues: "Had Mr. Jimenez's trial attorney known that Mr. Jones was available to testify prior to the close of evidence, Mr. Jones could have been put on the stand." (ECF No. 1-1:11). But when the trial court asked defense counsel whether he wanted to reopen his case to allow Mr. Jones to testify, defense counsel declined, moving instead for a mistrial. (Trial TR. Vol. IV 7).

The OCCA's determination that no *Brady* violation occurred was not contrary to and did not involve an unreasonable application of Supreme Court precedent. Thus, Petitioner is not entitled to habeas relief.

## IV. GROUND TWO

At trial, Chief Medical Examiner Dr. Eric Pfeifer testified as an expert witness. In part, his opinion had been based on an autopsy and related findings which had been completed by a different medical examiner, Dr. Maurice Tarau. Dr. Tarau did not testify at trial and had not been subject to any cross-examination at any time. (ECF No. 1-1:12-16). In Ground Two, Mr. Jimenez argues a violation of the Confrontation Clause through the admission of testimony from Dr. Pfeifer. The OCCA rejected Petitioner's challenge on direct appeal. (ECF No. 8-3:7-8). The Court should conclude that the OCCA's determination was reasonable and consistent with Supreme Court precedent.

## A. The Sixth Amendment Right of Confrontation

The Sixth Amendment of the United States Constitution guarantees an individual accused of a criminal offense the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. The "main and essential" purpose of the Sixth Amendment's Confrontation Clause "is to secure for the opponent the opportunity of cross-examination." *Van Arsdall*, 475 U.S. at 678 (citation omitted). In *Crawford v. Washington*, the United States Supreme Court held that the Confrontation Clause bars the admission of "testimonial hearsay" unless the declarant is shown to be unavailable to testify and the defendant had an earlier opportunity to cross-examine the declarant. *Crawford*, 541 U.S. at 51-54. A defendant's confrontation rights are implicated by the admission of testimonial statements against the defendant, however, only when they are admitted to establish the truth of the matter asserted in the statement. *See id.* at n.9 (explaining that the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.").

In both *Melendez–Diaz v. Massachusetts,* 557 U.S. 305 (2009) and *Bullcoming v. New Mexico,* 564 U.S. 647 (2011), the United States Supreme Court ruled that scientific reports were considered "testimonial hearsay" and could not be used as substantive evidence against a defendant unless the analyst who prepared and certified the report was subject to confrontation. In each case, the report at issue "contain[ed] a testimonial certification, made in order to prove a fact at a criminal trial." *Bullcoming*, 564 U.S. at 657. In *Williams v. Illinois*, however, the Supreme Court confirmed that the Confrontation Clause is not implicated when one expert gives an opinion which uses, as

"basis evidence," an out-of-court "testimonial statement" which has not been admitted into evidence and subject to cross-examination. *Williams v. Illinois*, 132 S. Ct 2221, 2234-44 (2012).

### B.    Dr. Pfeifer's Testimony

In September 2010, Dr. Tarau, an employee at the Oklahoma City Medical Examiner's office, performed an autopsy on the victim, Mr. Cruz. (Trial TR. Vol. II 182). Prior to trial, Dr. Tarau left the Oklahoma City Medical Examiner's office and in February 2012, Chief Medical Examiner Dr. Eric Pfeifer reviewed the victim's case file and documents related to the case. (Trial TR. Vol. II 182). At trial, Dr. Pfeifer testified regarding his usual procedure when preparing for trial. According to Dr. Pfeifer, when asked to review documents in a case such as Mr. Cruz', where he did not perform the autopsy, he generally reviewed autopsy reports; the in-house investigation narrative, also called a death scene summary; toxicology reports; x-rays; and any archived photographs that were performed at the autopsy. (Trial TR. Vol. II 182-183). Dr. Pfeifer testified that he followed this general procedure, reviewed the pertinent documents relating to Mr. Cruz, and was able to form several opinions regarding Mr. Cruz' death. (Trial TR. Vol. II 183-197).

According to Dr. Pfeifer, Mr. Cruz' manner of death was a homicide and the cause of death was a gunshot wound to the victim's back. (Trial TR. Vol II 183-184). Based on his review of photographs, Dr. Pfeifer also gave an opinion regarding where the bullet had entered and exited the victim's body, along with the bullet's likely pathway. (Trial TR. Vol. II 184-186, 191-193). Dr. Pfeifer stated that when a bullet

enters the skin and soft tissue, it spins at a high speed and tends to rub away the tissue, creating what the doctor termed "an abrasion collar." (Trial TR. Vol. II 191-192). Based on where he saw the abrasion collar, Dr. Pfeifer was able to testify that the bullet had entered Mr. Cruz in his lower left back. (Trial TR. Vol. II 190-192). Dr. Pfeifer also testified that he believed, based on his review of the photographs, that the bullet had existed Mr. Cruz' body from his lower abdomen, based on the irregular shape of a wound and presence of tissue there. (Trial TR. Vol. II 192).

Dr. Pfeifer also testified that the victim had suffered injuries to his vena cava and his mesenteric veins. (Trial TR. Vol. II 186-187). In the doctor's expert opinion, these injuries were life-threatening. (Trial TR. Vol. II 186-187). On cross-examination, Dr. Pfeifer confirmed that he did not perform the autopsy on Mr. Cruz, but that based on his "education and experience" he could "look at the reports and . . . pretty much tell what happened." (Trial TR. Vol. II 195).

### C.     No Violation of the Confrontation Clause

In Ground Two, Mr. Jimenez argues a violation of his Sixth Amendment right of confrontation through the trial court's admission of Dr. Pfeifer's expert testimony. According to Petitioner, Dr. Pfeifer's testimony violated the Confrontation Clause because: (1) Dr. Pfeifer's opinions were "testimonial hearsay" since they had been based on Dr. Tarau's autopsy findings and report and (2) the State had failed to prove that Dr. Tarau was unavailable to testify at trial. (ECF No. 1-1:12-16).

Mr. Jimenez presented his habeas arguments on direct appeal and the OCCA rejected the claims. (ECF No. 8-3:7-8). In doing so, the court stated:

In Proposition II Jimenez claims his right to confrontation was violated when the Chief Medical Examiner, Dr. Pfeifer, testified to Dr. Tarau's autopsy report. . . . Pfeifer testified that he usually reviewed the autopsy report, any toxicology report or x-rays, the investigative narrative, and archived photographs. Pfeifer testified he formed an opinion regarding Cruz's internal injuries from his review of the photographs, which included pictures of surgical interventions on Cruz's internal organs. While on the stand, Pfeifer marked Cruz's injuries on a standard Medical Examiner body diagram, based on his review of the photographs. Pfeifer did not testify about, or introduce into evidence, Tarau's autopsy report or his conclusions. The record does not support Jimenez' argument that Pfeifer had no independent basis for his opinion other than Tarau's report. This process was appropriate and did not violate Jimenez's right to confrontation.

Jimenez also argues that the State "put on no evidence" that Tarau was unavailable, but admits Pfeifer testified that Tarau no longer worked for the Medical Examiner's office. Jimenez did not raise the issue of Tarau's availability at trial, and has waived all but plain error. As we have established that Pfeifer's conclusions resulted from his independent investigation and were admissible, there was no error.

(ECF No. 8-3:7-8). The Court should conclude that the OCCA's determination was reasonable and consistent with United States Supreme Court precedent.

In *Williams v. Illinois*, the Supreme Court discussed the precise issue raised by Petitioner in the instant case—the constitutionality of allowing an expert witness to discuss another expert's "testimonial statements" as a basis for the expert witness' opinion. *Id.* at 2221. In *Williams*, a state police department sent vaginal swabs from a rape victim to Cellmark Diagnostics Laboratory for DNA testing. *Id.* at 2229. Cellmark sent back a report which identified a match to a male DNA profile. *Id.* The police department then ran a search to determine whether the Cellmark results matched anyone in the state DNA database. *Id.* The database showed a match to the petitioner in *Williams*, who was then put on trial for the rape. *Id.*

At trial, the State's DNA forensic expert gave an opinion which was based, in part, on the report from Cellmark. *Id.* The expert testified regarding the procedural use of the independent lab and that the results from the lab had matched the DNA found by the state police department, which turned out to belong to the Petitioner. *Id.* The expert did not testify to the truth of any of the matters asserted in the report or any of the work which had been done at the Cellmark lab. *Id.* at 2235. Also, the expert did not vouch for the quality of the work performed by Cellmark and the report had not been entered into evidence. *Id.* at 2229, 2235. On cross-examination, the expert confirmed that she did not conduct or observe any of the testing on the vaginal swabs, and that her testimony relied on the DNA profile produced by Cellmark. *Id.* at 2230.

The defense moved to exclude the expert's testimony as violating the Confrontation Clause because there was "no evidence with regards to . . . any work done by [Cellmark] to justify testimony coming into this case with regard to their analysis." *Id.* at 2231 (alteration in original). The trial court disagreed, stating that the expert's testimony had been "based on her own independent testing of the data received from [Cellmark]." *Id.* The Illinois Supreme Court affirmed, concluding that when the expert referenced the Cellmark report during her direct examination, she did so "'for the limited purpose of explaining the basis for [her expert opinion],' not for the purpose of showing 'the truth of the matter asserted' by the report." *Id.* at 2231-32 (alteration in original). Thus, the report was not used to establish its truth, but only "to show the underlying facts and data [the expert] used before rendering an expert opinion." *Id.* at 2232. The United States Supreme Court granted certiorari and affirmed.

In concluding that the expert's testimony did not violate the Confrontation Clause, the majority rejected the dissent's theory which had posited that the expert's testimony concerned the truth of the matters asserted in the Cellmark report, simply because the report had helped form the basis of the expert's testimony. In doing so, the majority explained that the disclosure of "basis evidence" can help the factfinder understand the expert's thought process and determine what weight to give to the expert's opinion. *Id.* at 2239. The Court explained:

> [I]f the factfinder were to suspect that the expert relied on factual premises with no support in the record, or that the expert drew an unwarranted inference from the premises on which the expert relied, then the probativeness or credibility of the expert's opinion would be seriously undermined. The purpose of disclosing the facts on which the expert relied is to allay these fears—to show that the expert's reasoning was not illogical, and that the weight of the expert's opinion does not depend on factual premises unsupported by other evidence in the record—not to prove the truth of the underlying facts.

*Id.*

*Williams v. Illinois* is controlling in the instant case. Here, as in *Williams*, Dr. Pfeifer's reference to the autopsy file which had been completed by Dr. Tarau was done so for the limited purpose of explaining the basis for Dr. Pfeifer's expert opinion, not for the purpose of showing the truth of the matter asserted by any portion of the file which had been completed by Dr. Tarau. Although the photographs which were part of the autopsy file were admitted into evidence, the actual autopsy report itself was not. As he confirmed on direct examination, Dr. Pfeifer gave his expert opinion about the cause and manner of death based on his education and expertise. Like in *Williams*, Dr. Pfeifer's review of the autopsy file was used as "basis evidence" to support his opinion.

Dr. Pfeifer did not comment on any of the conclusions reached in the autopsy report, but instead gave his own independent opinion regarding the cause and manner of the victim's death. Therefore, as in *Williams*, Dr. Pfeifer's testimony did not violate the Confrontation Clause. The OCCA reached this determination and the Court should conclude that the OCCA's conclusion was consistent with *Williams*. Therefore, Petitioner is not entitled to habeas relief on Ground Two.

## V.    GROUND THREE

In Ground Three, Petitioner alleges eight instances of prosecutorial misconduct. (ECF No. 1-1:16-22). According to Jimenez, the prosecutor improperly: (1) bolstered the testimony of a State witness, (2) vouched for the credibility of four witnesses, (3) withheld information regarding a witness, (4) made material misrepresentations regarding a witness' whereabouts, and (5) aroused sympathy for the victim. (ECF No. 1-1:16-22). The OCCA denied these claims on direct appeal. (ECF No. 8-3: 8-11). The OCCA's determination was reasonable.

### A.    Prosecutorial Misconduct Through Improper Comments

A prosecutor's improper comments violate the Constitution only if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citation omitted); *Hamilton v. Mullin*, 436 F.3d 1181, 1187 (10th Cir. 2006). To determine whether a trial was rendered fundamentally unfair, the court examines the entire proceeding, "including the strength of the evidence against the petitioner, both as to guilt at that stage of the trial and as to moral culpability at the sentencing phase' as well as [a]ny cautionary steps . .

. offered by the court to counteract improper remarks." *Bland v. Sirmons,* 459 F.3d 999, 1024 (10th Cir. 2006) (internal quotation marks and citations omitted). "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden*, 477 U.S. at 181. (internal quotation marks omitted). "The ultimate question is whether the jury was able to fairly judge the evidence in light of the prosecutors' conduct." *Bland,* 459 F.3d at 1024. When reviewing allegedly improper statements, "[t]he offending remark or action must be placed in the context of the whole trial, and not viewed in isolation." *Torres v. Mullin*, 317 F.3d 1145, 1159 (10th Cir. 2003).

Noting that Petitioner failed to object to any of the allegedly improper comments at trial, the OCCA reviewed for plain error and found none. (ECF No. 8-3:9-11). The Tenth Circuit Court of Appeals has found "no practical distinction" between the formulations of plain error used by the OCCA and the federal due-process test, requiring reversal when an error "so infused the trial with unfairness as to deny due process of law." *Thornburg v. Mullin,* 422 F.3d 1113, 1125 (10th Cir. 2005) (quoting *Estelle v. McGuire,* 502 U.S. 62, 75 (1991)). Because the OCCA applied the same test required for a due process determination, this Court defers to its ruling unless it "unreasonably appli[ed]" that test. *Thornburg*, 422 F.3d at 1125 (citing 28 U.S.C. § 2254(d)).

### B.     No Prosecutorial Misconduct

Considered in the context of the entire trial, and particularly in light of the overwhelming evidence of Petitioner's guilt presented at his trial, the allegedly

inappropriate remarks by the prosecutor during closing arguments did not deny Petitioner a fundamentally fair trial.

### 1. Bolstering and Vouching

It is improper for a prosecutor to engage in "vouching,"—"an assurance by the prosecuting attorney of the credibility of a government witness through personal knowledge or by other information outside of the testimony before the jury." *Littlejohn*, 704 F.3d at 837. "Argument or evidence is impermissible vouching only if the jury could reasonably believe that the prosecutor is indicating a personal belief in the witness' credibility, either through explicit personal assurances of the witness' veracity or by implicitly indicating that information not presented to the jury supports the witness' testimony." *United States v. Bowie,* 892 F.2d 1494, 1498 (10th Cir. 1990). Here, Mr. Jimenez complains that the prosecutor improperly bolstered the testimony of one witness and impermissibly vouched for four witness.

First, Mr. Jimenez argues that the prosecutor improperly attempted to bolster the testimony of Lyric Staton, when she asked:

> In your opinion, based on your training and experience interviewing witnesses, was Lyric Staton, would you categorize her that she lied and was deceptive or that she withheld information and it was more of a slow process to get her to tell you the full story?

Volume III Transcript of Proceedings had on the 27th day of March, 2013, before the Honorable Donald L. Deason, *State of Oklahoma v. Jimenez*, Case No. CF-2010-7726 (Okla. Co. Dist. Ct. Mar. 27, 2013) at 44. The OCCA rejected this claim, stating that the prosecutor's comment concerned opinion testimony rationally based on the officer's perception, training and experience, and helped the jurors decide a fact in

issue. (ECF No. 8-3:9). Giving deference under the AEDPA, the Court should conclude that the OCCA's determination was reasonable. The prosecutor's comment did not indicate a personal belief in Ms. Staton, rather her question concerned the arresting officer's expert opinion concerning Ms. Staton's demeanor and credibility while being interviewed.

Mr. Jimenez' arguments regarding the alleged vouching for state witnesses fares no better. First, as to Julio Chavez, the prosecutor stated: ". . . he is truthful. He is sincere and genuine. You can believe everything he told you from that witness stand because he was there that night." (Trial TR. Vol. IV. 13).

Second, as to Lyric Staton, the prosecutor said, "I submit to you she did not lie to the Oklahoma City Police Department, she did not lie here in the courtroom. Now she did hold back some information with good reason, and she told you why . . . [s]he held back, but she did not lie." (Trial TR. Vol. IV 47).

Third, while discussing the testimony of Shasta Adair and Brandon Jones, the prosecutor argued:

> It will be difficult to judge the credibility based on hearing it from a transcript, but it's up to you guys to weigh that and determine the credibility of that testimony that was given at a previous court appearance, at a preliminary hearing. I submit to you that you should consider that as credible. Those people were under oath, they came in, and they told you what they know.

(Trial TR. Vol. IV 12-13).

Fourth, regarding Brandon Jones, the prosecutor argued that Mr. Jones "didn't just make up a story to get a deal," and "it's not like Brandon just made all this up to

get a deal," and "he didn't come in here and just make up some crazy story trying to get a deal." (Trial TR. Vol. IV 38, 34, 48-49).

These statements by the prosecutor were neither explicit personal assurances of the witness' veracity, nor were they based on information not presented to the jury that supported the witness' testimony. Indeed, the comments that Petitioner objects to as improper vouching were nothing more than references to evidence which impacted the witnesses' credibility. *See Thornburg*, 422 F.3d at 1132 ("[I]t is not improper for a prosecutor to direct the jury's attention to evidence that tends to enhance or diminish a witness's credibility."); *see also Hanson*, 797 F.3d at 837 ("[A] prosecutor's discussion of a witness's credibility is not *per se* vouching."). The Court should conclude that none of the comments constituted improper vouching. The OCCA rejected the Petitioner's claims, stating that the comments were permissible arguments and reasonable inferences from the evidence. (ECF No. 8-3:9-10). This determination was reasonable and it is entitled to AEDPA deference.

### 2. Withholding Information and Material Misrepresentation

As discussed, the trial court deemed Brandon Jones unavailable for trial and his testimony from the preliminary hearing was submitted into evidence. However, after the testimony had been presented, but before the State rested its case, Mr. Jones was arrested and placed in the Oklahoma County Jail.

In Ground Three, Mr. Jimenez argues: (1) the State improperly withheld information regarding Brandon Jones' whereabouts after he was arrested in violation of *Brady v. Maryland*, and (2) during closing argument, the prosecutor made material

misrepresentations regarding Mr. Jones' whereabouts, indicating that that Mr. Jones was absent from trial because Mr. Jimenez had encouraged Mr. Jones to not testify against the Defendant, and to "take a vacation" instead. According to Petitioner, these comments were designed to intentionally mislead the jury regarding Mr. Jones' whereabouts at trial. (ECF No. 1-1:19-21). The OCCA rejected these claims on direct appeal, stating:

> Jimenez claims the State should not have argued that Jones was unavailable because Jimenez told him to take a vacation and not testify. This argument was based on evidence of jail phone calls in which Jones said he would be unavailable and Jimenez told him to get out of town and take a vacation. The prosecutor also argued that Jones went home after preliminary hearing, and did not appear at trial because he wanted Jimenez to go home too, rather than go to prison. Jimenez argues this was a material misrepresentation designed to mislead the jury. The record does not support this claim. Jones did not appear for trial. In jail phone calls between Jimenez and Jones, Jimenez urged Jones to take a vacation rather than testify. Nothing in the record suggests that, when Jones was arrested, he made any effort to contact Jimenez or the prosecution regarding his testimony in this case. Once the parties discovered Jones' whereabouts, the State did not prevent him from appearing. The parties agreed that Jones was arrested for unrelated crimes. The record does not show jailers knew that he had been declared unavailable in this trial. We rejected in Proposition I Jimenez's argument that the State is obliged to learn of any information regarding an unavailable witness known to any State agents, including law enforcement, when the information is unconnected to the prosecution at which he was called to testify. There was no prosecutorial misconduct, and thus no plain error.

(ECF No. 8-3:11).

As the OCCA determined, and as the undersigned previously discussed, no violation of *Brady v. Maryland* occurred following Mr. Jones' arrest and subsequent detention in the Oklahoma County Jail after he had been deemed "unavailable" to testify. There is no evidence that the prosecutor knew that Mr. Jones had been arrested

on unrelated charges and the OCCA refused to impute such knowledge to the State. *See* ECF No. 8-3:6 (noting that Petitioner's argument as set forth in Ground One "stretches *Brady* beyond all recognition."). Based on the prior legal analysis, the Court should reject Petitioner's claim as set forth in Ground Three arguing that the prosecutor improperly withheld information regarding Mr. Jones' whereabouts.

Additionally, the prosecutor's remarks which inferred that Mr. Jones was absent from trial because he had been encouraged by Mr. Jimenez to stay away from the trial and "take a vacation" were valid arguments because they had been made based on evidence which had been presented at trial in the form of phone calls between Mr. Jimenez and Mr. Jones. *See* Criminal Appeal Original Record, State's Exhibit 93. A prosecutor may speculate during closing argument if the remarks involve reasonable inferences based on the evidence. *See Hooper v. Mullin*, 314 F.3d 1162, 1172 (10th Cir. 2002). Based on the evidence, the prosecutor's statements were not material misrepresentations, but involved a reasonable inference from the evidence and did not render the trial fundamentally unfair. Accordingly, the Court should conclude that Petitioner is not entitled to habeas relief on claims that the State improperly withheld information regarding Mr. Jones' whereabouts or made material misrepresentations regarding the same.

### 3. Passion and Prejudice and Sympathy for the Victim

During closing argument, the prosecutor made the following comment regarding Julio Chavez, the victim's son: "I submit that Julio is lucky that he didn't get shot because this man tried to shoot him. Instead the worst thing Julio had to deal with is

the fact that he saw his father dying on the ground by trashcans." (Trial TR. Vol. IV 61). According to Petitioner, these comments "attempt[ed] to arouse the passions and prejudice of the jurors and obtain sympathy for the victim." (ECF No. 1-1:21). The OCCA rejected this argument, stating: "The argument accurately reflects the evidence; Chavez was lucky that Jimenez missed, and he did see his father die next to the trash cans." (ECF No. 8-3:10). This determination was reasonable and Petitioner is not entitled to habeas relief based on this comment. *See id.* at 1172 (a prosecutor may speculate during closing argument if the remarks involve reasonable inferences based on the evidence).

## VI. GROUND FOUR

In Ground Four, Petitioner argues that his defense counsel was ineffective by failing to: (1) properly cross-examine Brandon Jones at the preliminary hearing regarding the details of his plea agreement, (2) reopen the case when given the opportunity by the trial court when Mr. Jones became available to testify, (3) object to Dr. Pfeifer's testimony as improper testimonial hearsay in violation of the Confrontation Clause, and (4) object to allegedly improper statements made by the prosecutor. (ECF No. 1-1:22-25). The OCCA rejected these opinions on direct appeal. (ECF No. 8-3: 12-13). This determination was not contrary to, nor an unreasonable application of, Supreme Court precedent.

### A. Ineffective Assistance of Counsel

To prevail on a claim of ineffective assistance of counsel, the accused must prove deficient performance and prejudice. *Strickland v. Washington*, 466 U.S. 668, 687

(1984). To prove deficiency, the accused must overcome the strong presumption that counsel's conduct fell outside of the wide range of professional conduct, including trial strategy. *Id.* at 689. To prove prejudice, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. But on habeas review, the Court does not examine whether the elements of *Strickland* have been met. *Harrington*, 562 U.S. at 101. Instead, the pivotal question is whether the state court's application of *Strickland* was reasonable. *Id.* The Court should answer this question affirmatively.

### B.    No Ineffective Assistance of Counsel

The OCCA rejected all of Mr. Jimenez' allegations that his defense counsel rendered ineffective assistance. (ECF No. 8-3: 12-13). These determinations were consistent with Supreme Court authority.

First, Petitioner argued that his defense counsel was ineffective for failing to perform a proper cross-examination at the preliminary hearing regarding the details of Mr. Jones' plea agreement. (ECF No. 1-1:23-24). According to Petitioner, the failure resulted in the exclusion of important impeachment evidence regarding Mr. Jones' motivations in testifying. (ECF No. 1-1:23-24). The OCCA rejected this argument, noting that it had essentially done so when Petitioner raised the argument as a violation of the Confrontation Clause in Proposition I. (ECF No. 8-3:12). Ultimately, the jurors were apprised of Mr. Jones' entire plea agreement and had a proper basis for judging his veracity. Thus, any error that defense counsel may have performed during his cross-

examination of Mr. Jones resulted in no prejudice. Accordingly, the OCCA properly applied *Strickland* and habeas relief is not warranted.

Next, Mr. Jimenez argues that his defense counsel was ineffective for failing to reopen the trial and call Mr. Jones to the stand as a witness, once he became available to testify. (ECF No. 1-1:25). But when given the opportunity to do so, defense counsel declined, stating: "No. Because I've already voir dired this jury that he's not - - There's no way I can unring all the things I've done. . . . It would be silly for me to get up here now and say, okay, now he's here, let me cross examine him. There's no way I can do that." (Trial TR. Vol. IV 7). The OCCA recognized defense counsel's actions as a reasonable trial strategy, which they would not second guess. (ECF No 8-3:12-13). In doing so, the court noted that if defense counsel had reopened the case and called Mr. Jones as a witness, "it would have given jurors the chance to hear the case against Jimenez directly from Jones, after jurors had already heard his preliminary hearing testimony." (ECF No. 8-3:13). The OCCA's analysis based on "trial strategy" was a reasonable interpretation of, and consistent with, Supreme Court precedent. *See id.* at 108 ("An attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense.").

Finally, Mr. Jimenez alleges that defense counsel failed to object to: (1) Dr. Pfeifer's testimony as improper testimonial hearsay and (2) improper statements made by the prosecutor. (ECF No. 1-1:22-25). The OCCA rejected these claims, citing its earlier determinations that there had been no error in admitting Dr. Pfeifer's testimony and no prosecutorial misconduct. (ECF No. 8-3:13). Because no underlying errors

existed regarding the substantive claims, no prejudice ensued from counsel's failure to object in these instances. *See Hanson*, 797 F.3d at 837 (denying petitioner's claim of ineffective of counsel which was premised on a failure to object when the underlying claim was without merit). The OCCA's determination was a proper application of Supreme Court precedent and as such, Petitioner is not entitled to habeas relief.

## VII.  GROUND FIVE

In Ground Five, Petitioner contends that he is entitled to habeas relief based on cumulative errors. (ECF No. 1-1:26). The OCCA denied this claim on the merits, stating: "We found no error in the preceding propositions. Where there is no error, there is no cumulative error." (ECF No. 8-3:13).

"A cumulative error analysis aggregates all the errors that individually might be harmless, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *Thornburg*, 422 F.3d at 1137 (reviewing OCCA's cumulative error decision under the AEDPA by reference to *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974). "In the federal habeas context, the only otherwise harmless errors that can be aggregated are federal constitutional errors, and such errors will suffice to permit relief under cumulative error doctrine only when the constitutional errors committed in the state court trial so fatally infected the trial that they violated the trial's fundamental fairness." *Littlejohn*, 704 F.3d at 868 (internal quotation marks omitted). As that language implies, "cumulative-error analysis 'aggregates all constitutional errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no

longer be determined to be harmless,' an analysis . . . undertake[n] only if there are at least two errors." *Fairchild v. Trammell*, 784 F.3d 702, 724 (10th Cir. 2015) (quoting *Lott v. Trammell*, 705 F.3d 1167, 1223 (10th Cir. 2013)). Likewise, "[c]umulative error analysis applies where there are two or more actual errors; it does not apply to the cumulative effect of non-errors." *Moore v. Reynolds*, 153 F.3d 1086, 1113 (10th Cir. 1998).

The Tenth Circuit has recognized that a circuit split exists regarding whether the requirement to conduct a cumulative-error analysis is clearly established federal law under 28 U.S.C. § 2254(d)(1). *See Cole v. Trammell*, 755 F.3d 1142, 1177 n.14 (10th Cir. 2014). However, the Tenth Circuit also notes that its precedent "may very well signal where our court has come down on the issue—*viz.*, that cumulative-error analysis is clearly established law." *Id.* (citation omitted).

Here, no errors, harmless or otherwise, exist. Thus, under *Cole*, the Court should conclude that the OCCA's decision on Petitioner's cumulative-error claim was not unreasonable or contrary to such clearly established federal law. *See Thornburg*, 422 F.3d at 1137-38; 28 U.S.C. § 2254(d)(1). Accordingly, the Court should deny habeas relief on Ground Five.

## VIII. RECOMMENDATION

It is recommended that Mr. Jimenez' Petition for Writ of Habeas Corpus be **DENIED**.

## IX.    NOTICE OF RIGHT TO OBJECT

The parties are advised of their right to file an objection to this Report and Recommendation with the Clerk of this Court by **July 11, 2016**, in accordance with 28 U.S.C. § 636 and Fed. R. Civ. P. 72. The parties are further advised that failure to make timely objection to this Report and Recommendation waives the right to appellate review of both factual and legal issues contained herein. *Casanova v. Ulibarri*, 595 F.3d 1120, 1123 (10th Cir. 2010).

## X.    STATUS OF REFERRAL

This Report and Recommendation terminates the referral by the District Judge in this matter.

ENTERED on June 23, 2016.

SHON T. ERWIN
UNITED STATES MAGISTRATE JUDGE